# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

| | |
|---|---|
| CATHERINE KUEPPERS, and KATHLEEN SUMMY, WATANYA BROWN, and ASHTON HIGGINBOTHAM, individually and on behalf of all others similarly situated, | Civil Action No. 24-cv-61983 |
| Plaintiffs, | |
| v. | **DEMAND FOR JURY TRIAL** |
| ZUMBA FITNESS, LLC, | |
| Defendant. | |

## <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>

## INTRODUCTION

Catherine Kueppers ("Plaintiff Kueppers"), Kathleen Summy ("Plaintiff Summy"), Watanya Bown ("Plaintiff Brown"), and Ashton Higginbotham ("Plaintiff Higginbotham") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, make the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to allegations pertaining specifically to themselves or their counsel, which are based on personal knowledge.[1]

## NATURE OF THE CASE

1.      Plaintiffs brings this action to redress Defendant Zumba Fitness, LLC's ("Defendant") practice of knowingly disclosing Plaintiffs' and its other customers' identities and the identities of the prerecorded video materials to which they purchased access on Defendant's www.zumba.com website (the "Website") to third parties in violation of the federal Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

2.      Over the past two years, Defendant has systematically transmitted (and continues to transmit today) its customers' personally identifying video viewing information to at least seven companies using snippets of tracking code.

---

[1] Pursuant to Federal Rule of Civil Procedure 15(1)(2), this First Amended Class Action Complaint is filed with the written consent of Defendant Zumba Fitness, LLC.

3.      Defendant knowingly and intentionally transmitted this personally identifying information to: (i) Meta Platforms, Inc. ("Meta"), formerly known as Facebook, Inc.; (ii) Pinterest, Inc. ("Pinterest"); (iii) Alphabet, Inc., formerly known as Google ("Google"); X Corp., formerly known as Twitter, Inc. ("Twitter"); HubSpot, Inc. ("HubSpot"); NextRoll, Inc. ("NextRoll"); The Trade Desk, Inc. ("theTradeDesk"); and MNTN, Inc. ("Mountain").

4.      In the simplest terms, the tracking codes installed by Defendant capture and disclose to their respective third parties information that reveals the specific video materials that a particular person requested or obtained on Defendant's Website (hereinafter, "Private Video Information").

5.      Defendant disclosed and continues to disclose its customers' Private Video Information to these third parties without asking for, let alone obtaining, its customers' consent to these practices.

6.      The VPPA clearly prohibits what Defendant has done.  Subsection (b)(1) of the VPPA provides that, absent the consumer's prior informed written consent, any "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for," 18 U.S.C. § 2710(b)(1), damages in the amount of $2,500.00, *see id.* § 2710(c).

7.      Accordingly, on behalf of themselves and the putative Class members defined below, Plaintiffs bring this Class Action Complaint against Defendant for

intentionally and unlawfully disclosing their Private Video Information to third parties.

## **PARTIES**

### I.    **Plaintiff Catherine Kueppers**

8.    Plaintiff Kueppers is, and at all times relevant hereto was, a citizen and resident of Brevard County, Florida.

9.    Plaintiff Kueppers has used and continues to use the same device to maintain and access an active Facebook account throughout the relevant period in this case.

10.    Plaintiff Kueppers purchased a video on-demand Zumba Instructor Training Course from Defendant's Website, which provided her access to prerecorded video materials.

11.    Plaintiff Kueppers provided her name, email address, and home address in association with the purchase of these materials.

12.    Plaintiff Kueppers has purchased and watched prerecorded video materials on Defendant's Website during the time frame applicable to this case. Accordingly, Plaintiff Kueppers requested or obtained, and is therefore a consumer of, prerecorded video materials sold by Defendant on its Website.

13.    At all times relevant hereto, including when purchasing access to prerecorded video material from Defendant on its Website, Plaintiff Kueppers had a Meta account, a Meta profile, and an FID associated with such profile.

14.     Plaintiff Kueppers has watched the prerecorded videos to which she purchased access on Defendant's Website while logged into Facebook during the last two years.

15.     When Plaintiff Kueppers purchased access to prerecorded videos from Defendant, Defendant disclosed to Meta Plaintiff Kueppers's FID coupled with a URL identifying the prerecorded video materials she purchased, among other information about Plaintiff and the device she used to make the purchase.

16.     When Plaintiff Kueppers purchased access to prerecorded videos from Defendant, Defendant disclosed to numerous other third parties (including Pinterest, Google, Twitter, HubSpot; NextRoll, theTradeDesk, and Mountain) a URL to a webpage identifying Plaintiff Kueppers by name and identifying the prerecorded video materials she purchased, among other information about Plaintiff and the device she used to make the purchase.

17.     Plaintiff Kueppers has never consented, agreed, authorized, or otherwise permitted Defendant to disclose her Private Video Information to Meta or any other third party.

18.     Because Defendant disclosed Plaintiff Kueppers's Private Video Information to Meta and other third parties during the applicable statutory period, Defendant violated Plaintiff Kueppers's rights under the VPPA and invaded her statutorily conferred interest in keeping such information (which bears on her personal affairs and concerns) private.

## II.     Plaintiff Kathleen Summy

19.     Plaintiff Summy is, and at all times relevant hereto was, a citizen and resident of Wood County, Wisconsin.

20.     Plaintiff Summy has used and continues to use the same device to maintain and access an active Facebook account throughout the relevant period in this case.

21.     Plaintiff Summy purchased a video on-demand Zumba Instructor Training Course from Defendant's Website, which provided her access to prerecorded video materials.

22.     Plaintiff Summy provided her name, email address, and home address in association with the purchase of these materials.

23.     Plaintiff Summy has purchased and watched prerecorded video materials on Defendant's Website during the time frame applicable to this case.  Accordingly, Plaintiff Summy requested or obtained, and is therefore a consumer of, prerecorded video materials sold by Defendant on its Website.

24.     At all times relevant hereto, including when purchasing access to prerecorded video material from Defendant on its Website, Plaintiff Kueppers had a Meta account, a Meta profile, and an FID associated with such profile.

25.     Plaintiff Summy has watched the prerecorded videos to which she purchased access on Defendant's Website while logged into Facebook during the last two years.

5

26.     When Plaintiff Summy purchased access to prerecorded videos from Defendant, Defendant disclosed to Meta Plaintiff Summy's FID coupled with a URL identifying the prerecorded video materials she purchased, among other information about Plaintiff and the device she used to make the purchase.

27.     When Plaintiff Summy purchased access to prerecorded videos from Defendant, Defendant disclosed to numerous other third parties (including Pinterest, Google, Twitter, HubSpot; NextRoll, theTradeDesk, and Mountain) a URL to a webpage identifying Plaintiff Summy by name and identifying the prerecorded video materials she purchased, among other information about Plaintiff and the device she used to make the purchase.

28.     Plaintiff Summy's Facebook account was set to public status when she purchased the prerecorded video materials from Defendant's Website.

29.     Plaintiff Summy has never consented, agreed, authorized, or otherwise permitted Defendant to disclose her Private Video Information to Meta or any other third party.

30.     Because Defendant disclosed Plaintiff Summy's Private Video Information to Meta and other third parties during the applicable statutory period, Defendant violated Plaintiff Summy's rights under the VPPA and invaded her statutorily conferred interest in keeping such information (which bears on her personal affairs and concerns) private.

### III.    Plaintiff Watanya Brown

31.    Plaintiff Brown is, and at all times relevant hereto was, a citizen and resident of Baldwin County, Alabama.

32.    Plaintiff Brown has used and continues to use the same device to maintain and access an active Facebook account throughout the relevant period in this case.

33.    Plaintiff Brown purchased a video on-demand Zumba Instructor Training Course from Defendant's Website, which provided her access to prerecorded video materials.

34.    Plaintiff Brown provided her name, email address, and home address in association with the purchase of these materials.

35.    Plaintiff Brown has purchased and watched prerecorded video materials on Defendant's Website during the time frame applicable to this case.  Accordingly, Plaintiff Brown requested or obtained, and is therefore a consumer of, prerecorded video materials sold by Defendant on its Website.

36.    At all times relevant hereto, including when purchasing access to prerecorded video material from Defendant on its Website, Plaintiff Brown had a Meta account, a Meta profile, and an FID associated with such profile.

37.    Plaintiff Brown has watched the prerecorded videos to which she purchased access on Defendant's Website while logged into Facebook during the last two years.

38.    When Plaintiff Brown purchased access to prerecorded videos from

7

Defendant, Defendant disclosed to Meta Plaintiff Brown's FID coupled with a URL identifying the prerecorded video materials she purchased, among other information about Plaintiff and the device she used to make the purchase.

39.     When Plaintiff Brown purchased access to prerecorded videos from Defendant, Defendant disclosed to numerous other third parties (including Pinterest, Google, Twitter, HubSpot; NextRoll, theTradeDesk, and Mountain) a URL to a webpage identifying Plaintiff Brown by name and identifying the prerecorded video materials she purchased, among other information about Plaintiff and the device she used to make the purchase.

40.     Plaintiff Brown's Facebook account was set to public status when she purchased the prerecorded video materials from Defendant's Website.

41.     Plaintiff Brown has never consented, agreed, authorized, or otherwise permitted Defendant to disclose her Private Video Information to Meta or any other third party.

42.     Because Defendant disclosed Plaintiff Brown's Private Video Information to Meta and other third parties during the applicable statutory period, Defendant violated Plaintiff Brown's rights under the VPPA and invaded her statutorily conferred interest in keeping such information (which bears on her personal affairs and concerns) private.

### IV.    Plaintiff Ashton Higginbotham

43.    Plaintiff Higginbotham is, and at all times relevant hereto was, a citizen and resident of St. Clair County, Alabama.

44.    Plaintiff Higginbotham purchased a video on-demand Zumba Instructor Training Course from Defendant's Website, which provided her access to prerecorded video materials.

45.    Plaintiff Higginbotham provided her name, email address, and home address in association with the purchase of these materials.

46.    Plaintiff Higginbotham has purchased and watched prerecorded video materials on Defendant's Website during the time frame applicable to this case. Accordingly, Plaintiff Higginbotham requested or obtained, and is therefore a consumer of, prerecorded video materials sold by Defendant on its Website.

47.    At all times relevant hereto, including when purchasing access to prerecorded video materials from Defendant on its Website, Plaintiff Higginbotham had a Pinterest account, a Pinterest profile, and a Pinterest User ID associated with such profile.

48.    Plaintiff Higginbotham has watched the prerecorded videos to which she purchased access on Defendant's Website while logged into Pinterest during the last two years.

49.    When Plaintiff Higginbotham purchased access to prerecorded videos from Defendant, Defendant disclosed to Pinterest Plaintiff Higginbotham's User ID

coupled with a URL identifying the prerecorded video materials she purchased, among other information about Plaintiff and the device she used to make the purchase.

50.    When Plaintiff Higginbotham purchased access to prerecorded videos from Defendant, Defendant disclosed to numerous other third parties Plaintiff Higginbotham's name and a URL identifying the prerecorded video materials she purchased, among other information about Plaintiff and the device she used to make the purchase.

51.    When Plaintiff Higginbotham purchased access to prerecorded videos from Defendant, Defendant disclosed to numerous other third parties (including Meta, Google, Twitter, HubSpot; NextRoll, theTradeDesk, and Mountain) a URL to a webpage identifying Plaintiff Brown by name and identifying the prerecorded video materials she purchased, among other information about Plaintiff and the device she used to make the purchase.

52.    Plaintiff Higginbotham has never consented, agreed, authorized, or otherwise permitted Defendant to disclose her Private Video Information to Pinterest or any other third party.

53.    Because Defendant disclosed Plaintiff Higginbotham's Private Video Information to Pinterest and other third parties during the applicable statutory period, Defendant violated Plaintiff Higginbotham's rights under the VPPA and invaded her statutorily conferred interest in keeping such information (which bears on her personal affairs and concerns) private.

## V.    Defendant Zumba Fitness, LLC

54.    Defendant Zumba Fitness, LLC is a Florida limited liability company with a principal place of business at 800 Silks Run, Suite 2310, Hallandale, FL 33009.

55.    Defendant operates the Website www.zumba.com, which offers for sale access to various prerecorded videos concerning Defendant's trademarked dance-oriented workout program.

56.    Defendant conducts business within the jurisdictional boundaries of this district, is registered to do business in the State of Florida, and may be served process through its registered agent, Alberto Aghion, at the address 800 Silks Run, Suite 2310, Hallandale, FL 33009.

## JURISDICTION AND VENUE

57.    The Court has subject-matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2710.

58.    Personal jurisdiction and venue are proper because Defendant maintains its headquarters and principal place of business in Hallandale, Florida, which is within this judicial District.

## VIDEO PRIVACY PROTECTION ACT

59.    The VPPA prohibits companies (like Defendant) from knowingly disclosing to third parties (like Meta, Pinterest, Google, Twitter, HubSpot, NextRoll, theTradeDesk, and Mountain) information that personally identifies consumers (like

Plaintiffs and the putative class members) as having requested or obtained particular videos or other audio-visual materials.

60.     Specifically, subject to certain exceptions that do not apply here, the VPPA prohibits "a video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider[.]"   18 U.S.C. § 2710(b)(1).   The statute defines a "video tape service provider" as "any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4).  It defines a "consumer" as "a renter, purchaser, or subscriber of goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1).  "'[P]ersonally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).

61.     Leading up to the VPPA's enactment in 1988, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes."   S. Rep. No. 100-599 at 7-8 (1988) (statements of Sen. Simon). Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials because such records offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in

sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." *Id*. at 8 (statement of Sen. Leahy).

62.     Thus, in proposing the Video and Library Privacy Protection Act (which later became the VPPA), Senator Patrick J. Leahy (the senior Senator from Vermont from 1975 to 2023) sought to codify, as a matter of law, that "our right to privacy protects the choice of movies that we watch with our family in our own homes." 134 Cong. Rec. S5399 (May 10, 1988).   As Senator Leahy explained at the time, the personal nature of such information, and the need to protect it from disclosure, is the raison d'être of the statute: "These activities are at the core of any definition of personhood.  They reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people." *Id*.

63.     While these statements rang true in 1988 when the act was passed, the importance of legislation like the VPPA in the modern era of data mining is more pronounced than ever before.  During a more recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom.  Today, social networking, video streaming, the 'cloud,'

mobile apps and other new technologies have revolutionized the availability of Americans' information."[2]

64.     Former Senator Al Franken may have said it best: "If someone wants to share what they watch, I want them to be able to do so . . . But I want to make sure that consumers have the right to easily control who finds out what they watch—and who doesn't.  The Video Privacy Protection Act guarantees them that right."[3]

65.     In this case, however, Defendant deprived Plaintiffs and numerous other similarly situated persons of that right by systematically (and surreptitiously) disclosing their Private Video Information to Meta, without providing notice to (let alone obtaining consent from) any of them, as explained in detail below.

## BACKGROUND FACTS

### I.     Consumers' Personal Information Has Real Market Value

66.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything

---

[2] The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary. senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21stcentury.

[3] Chairman Franken Holds Hearing on Updated Video Privacy Law for 21st Century, franken.senate.gov (Jan. 31, 2012).

we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[4]

67.    Over two decades later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a 26 billion dollar per year online advertising industry in the United States.[5]

68.    The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable.  Data is currency.  The larger the data set, the greater potential for analysis – and profit.[6]

69.    In fact, an entire industry exists where companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[7]

---

[4]    Transcript, *The Information Marketplace* (Mar. 13, 2001), at 8-11, available at https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

[5] *See* Julia Angwin and Emily Steel, *Web's Hot New Commodity: Privacy*, Wall Street Journal (Feb. 28, 2011), available at https://www.wsj.com/articles/SB10001424052748703529004576160764037920274.

[6]    Statement of FTC Cmr. Harbour (Dec. 7, 2009), at 2, available at https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf

[7] *See* M. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), available at http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ .

70.     The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[8]

71.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[9]

72.     Recognizing the severe threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data, stating in pertinent part:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[10]

---

[8] N. Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), available at https://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html#:~:text=It's%20called%20the%20Acxiom%20Corporation,to%20know%20much%2C%20much%20more.

[9] Letter from Sen. J. Rockefeller IV, Sen. Cmtee. On Commerce, Science, and Transportation, to S. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) available at https://www.commerce.senate.gov/services/files/3bb94703-5ac8-4157-a97b-%20a658c3c3061c.

[10] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Sen. Markey (July 24, 2012), available at https://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information.

73.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams, including fraudulent sweepstakes, charities, and buying clubs.   Thus, when companies like Defendant share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[11]

74.     Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged.   Thus, information disclosures like Defendant's are particularly troublesome because of their cascading nature:  "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[12]

75.     Defendant is not alone in violating its customers' statutory rights and jeopardizing their well-being in exchange for increased revenue: disclosing customer and subscriber information to data aggregators, data appenders, data cooperatives,

---

[11] *See* Charles Duhigg, *Bilking the Elderly, with a Corporate Assist*, N.Y. Times (May 20, 2007), available at https://www.nytimes.com/2007/05/20/business/20tele.html.

[12] *Id.*

direct marketers, and other third parties has become a widespread practice. Unfortunately for consumers, however, this growth has come at the expense of their most basic privacy rights.

## II.    Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases

76.    As the data aggregation industry has grown, so has consumer concerns regarding personal information.

77.    A survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do protect their privacy online.[13]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[14]

78.    Thus, as consumer privacy concerns grow, consumers increasingly incorporate privacy concerns and values into their purchasing decisions, and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.  In fact, consumers' personal information has become such

---

[13] *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf.

[14] *Id.*

a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[15]

79.   These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[16]

80.   Thus, in today's digital economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[17] As such, where a business offers customers a product or service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a product or service of less value than the product or service paid for.

---

[15] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), available at https://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html.

[16] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on Monetizing Privacy* (Feb. 27, 2012), available at https://www.enisa.europa.eu/publications/monetising-privacy.

[17] *See* Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, available at https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf.

### III.    Defendant is a Video Tape Service Provider

81.    Defendant sells access to prerecorded video materials to consumers on the Website (www.zumba.com).

82.    These materials include thousands of hours of prerecorded videos.  The prerecorded videos offered for sale by Defendant fall into two primary categories: (1) on-demand Zumba instructor training courses and (2) workout classes hosted by Zumba instructors.

83.    The screenshot below provides a sample of the on-demand (e.g., prerecorded) Zumba instructor training course videos which are available for purchase on Defendant's Website:[18]

---

[18] Zumba Fitness, LLC, "Find a training and become a dance fitness instructor," available at https://www.zumba.com/en-US/trainings.



84.     As pictured above, the "Zumba Basic 1" course is an "introductory training" that provides "the tools you need to lead your own Zumba class." It covers the "Zumba formula, our four basic rhythms, and more!"[19]

---

[19] *Id.*

85.     Elsewhere on the Website, the "Zumba Basic 1" course on-demand course is described as "an online training that includes 10 hours of premium content broken up into 16 modules that you can complete at your own pace!"[20]

86.     As pictured above, descriptions of the other video on-demand instructor training programs, including CIRCL Mobility, Zumba Gold Toning, and Plate by Zumba, are also available on the Website.

87.     Workout classes are a separate category of videos available for purchase on the Website.  A sample of these classes is pictured in the screenshot below:[21]

---

[20]    Zumba   Fitness,   LLC,   "Become   a   Licensed   Zumba   Instructor,"   available   at https://www.zumba.com/en-US/become-a-zumba-instructor.

[21] Zumba Fitness, LLC, "Zumba – Ditch the Workout, Join the Party," available at https://www.zumba.com/en-US/class_search?searchType=vod&startDate=2024-10-21&startTime=0&endTime=24&days=&workoutLevels=any&orderBy=weighted&classTypes=zumba%2Czumba-step%2Czumba-toning%2Caqua-zumba%2Czumba-sentao%2Czumba-gold%2Czumba-gold-toning%2Czumba-kids%2Czumba-kids-jr%2Czumba-in-the-circuit&music=&showSavedInstructorsFirst=1.

22



88.     As shown above, the workout classes are prerecorded videos that come in different lengths and are offered for sale at different price points.   There are hundreds of such videos offered for sale on Defendant's Website.

**IV.    Defendant Uses Tracking Pixels and Code on the Website to Systematically Disclose its Customers' Private Video Information to Meta, Pinterest, Google, Twitter, HubSpot, NextRoll, theTradeDesk, and Mountain.**

89.     A tracking pixel is a piece of JavaScript code added to a website as a graphic element that is loaded when a user arrives at the website hosting the pixel (sometimes also referred to as "tracking code").

23

90.     When a user visits a website which has tracking pixels or code enable, an instance of the tracking pixel or code loads in the HTML code of the page on the user's web browser.

91.     Sometimes, a cookie corresponding to the tracking pixel already exists in the browser.  In those cases, the cookie contains a unique ID that follows the user of the internet browser from web page to web page, and that cookie connects with the tracking pixel.

92.     In other cases, a cookie corresponding to the cookie does not exist on the browser.  In those cases, a unique ID is created and saved in a cookie.

93.     After identifying the corresponding cookie (with its unique ID), the tracking pixel's embedded URL points to a third party's (e.g. Meta, Pinterest, etc.) designated tracking URL and reports to the third party the user's activity for the duration of the visit, along with the unique ID stored in the cookie which identifies the specific web user.

94.     To implement a tracking pixel, a website administrator must place the base tracking pixel code in the website's JavaScript code.  That code acts as an initiator for the tracking pixel's behavior.  Once initiated, the code will load a library of functions (e.g., fbevents.js for the Meta Pixel) that enable to pixel to respond to certain actions taken by the user of the internet browser and initiate data transmissions regarding the user (e.g., sending query string parameters and cookie values) to the third-party's tracking URL.

24

95.     Defendant has installed and programmed tracking pixels from at least Meta and Pinterest on the Website and uses these pixels to transmit the Private Video Information of its customers to those third parties in violation of the VPPA.

**A.    The Meta Pixel**

96.     Defendant has disclosed the Private Video Information of its customers to Meta using a snippet of programming code called the "Meta Pixel," which Defendant installed and configured on the Website.

97.     The information that Defendant disclosed (and continues to disclose) to Meta via the Meta Pixel includes the customer's Facebook ID ("FID") and the identity of the specific prerecorded video material that each of its customers requested or obtained through a purchase made on the Website.

98.     An FID is a unique sequence of numbers linked to a specific Meta profile.   A Meta profile, in turn, identifies by name the specific person to whom the profile belongs (and also contains other personally identifying information about the person, such as their photographs, contact information, employer, etc.).

99.     Entering "Facebook.com/[FID]" into a web browser returns the Meta profile of the person to whom the FID corresponds.  Thus, the FID identifies a person more precisely than a name, as numerous persons may share the same name, but each person's Facebook profile (and associated FID) uniquely identifies one and only one

person.  When someone has access to an individual's FID, they are able to precisely identify that individual person.

100.   As alleged below, whenever a person with a Meta account purchases prerecorded video material on Defendant's Website, the Meta Pixel technology that Defendant intentionally installed on its Website transmits the customer's Private Video Information (e.g., their personally identifying information and the specific video materials they requested or obtained) to Meta – all without the customer's consent, and in clear violation of the VPPA.

101.   On February 4, 2004, Mark Zuckerberg and others launched Facebook, now known as "Meta."[22]  Meta is now the world's largest social media platform.  To create a Meta account, a person must provide, *inter alia*, his or her first and last name, birth date, gender, and phone number or email address.

102.   The Meta Pixel, first introduced in 2013 as the "Facebook Pixel," is a unique string of code that companies can embed on their websites to monitor and track the actions taken by visitors to their websites and to report them back to Meta. This allows companies like Defendant, Meta, and third-party marketing companies to build detailed profiles about websites' customers and serve them with highly targeted advertising.

---

[22] *See* Facebook, "Company Info," available at https://about.fb.com/company-info./.

103.    A Meta Pixel installed on a company's website allows Meta to "match [] website visitors to their respective Facebook User accounts."[23]  This is because Meta has assigned to each of its users an "FID" number – a unique and persistent identifier that allows anyone to look up the user's unique Meta profile and thus identify the user by name[24] – and because each transmission of information made from a company's website to Meta via the Meta Pixel is accompanied by, *inter alia*, the FID of the website's visitor.

104.    As Meta's developer's guide explains, installing the Meta Pixel on a website allows Meta to track actions that users with Meta accounts take on the site. Meta states that "Examples of [these] actions include adding an item to their shopping cart or making a purchase."[25]

105.    Meta's Business Tools Terms govern the use of Meta's Business Tools, including the Meta Pixel.[26]

---

[23] Meta, "Get Started – Meta Pixel," available at https://developers.facebook.com/docs/meta-pixel/get-started/.

[24] For example, Mark Zuckerberg's FID is reportedly the number "4," so logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck, and all of the additional personally identifiable information contained therein.

[25]      Meta,      "About      Meta      Pixel,"      available      at https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[26]      Meta,      "Meta      Business      Tools      Terms,"      available      at https://www.facebook.com/legal/technology_terms.

106.   Meta's Business Tools Terms state that website operators may use Meta's Business Tools, including the Meta Pixel, to transmit the "Contact Information" and "Event Data" of their website visitors to Meta.

107.   Meta's Business Tools Terms define "Contact Information" as "information that personally identifies individuals, such as names, email addresses, and phone numbers . . . ."[27]

108.   Meta's Business Tools Terms state: "You instruct us to process the Contact Information solely to match the Contact Information against user IDs [e.g., FIDs] ("Matched User IDs"), as well as to combine those user IDs with corresponding Event Data."[28]

109.   The Business Tools Terms define "Event Data" as, *inter alia*, "information that you share about people and the actions that they take on your websites and apps or in your shops, such as visits to your sites, installations of your apps, and purchases of your products."[29]

110.   Website operators use the Meta Pixel to send information about visitors to their websites to Meta.  Every transmission to Meta accomplished through the

---

[27] *Id.*

[28] *Id.*

[29] *Id.*

Meta Pixel includes at least two elements: (1) the website visitor's FID and (2) the URL of the webpage triggering the transmission.

111.   Depending on the configuration of the Meta Pixel, the website may also send Event Data to Meta.  Defendant has configured the Meta Pixel on its Website to send Event Data to Meta.

112.   When website operators make transmissions to Meta through the Meta Pixel, none of the following categories of information are hashed or encrypted: the visitor's FID, the URL of the website, or the Event Data.

113.   Every website operator installing the Meta Pixel must agree to the Meta Business Tools Terms.[30]

114.   Simply put, if a company chooses to install the Meta Pixel on its website, both the company who installed it and Meta (the recipient of the information it transmits) are then able to "track [] the people and type of actions they take,"[31] including, as relevant here, the specific prerecorded video material that they purchase or view on the website.

115.   The Meta Pixel can follow a consumer to different websites and across the Internet even after the consumer's browser history has been cleared.

---

[30] *See id.*

[31] Meta, "Retargeting: How to Advertise to Existing Customers with Ads on Facebook," available at https://www.facebook.com/business/goals/retargeting?checkpoint_src=any.

116.   Meta has used the Meta Pixel to amass a vast digital database of dossiers comprised of highly detailed personally identifying information about each of its billions of users worldwide, including information about all of its users' interactions with any of the millions of websites across the Internet on which the Meta Pixel is installed.  Meta then monetizes this Orwellian database by selling advertisers the ability to serve highly targeted advertisements to the persons whose personal information is contained within it.

117.   Defendant knowingly uses the Meta Pixel to transmit the Private Video Information of its customers to Meta.

118.   Whenever a person with a Meta account purchases prerecorded video materials on the Website, Defendant uses – and has used at all times relevant hereto – the Meta Pixel to disclose to Meta the unencrypted FID of the person who made the purchase as well as information identifying the prerecorded video materials requested or obtained from Defendant.

119.   Defendant uses the Meta Pixel to transmit its customers' FID and the URL of each page in the Website's check-out flow to Facebook.  This means that the customer's identity is transmitted to Meta at each stage of their purchasing process.  The URLs transmitted to Meta during this process identify the video materials requested or obtained by the consumer.

120.    For example, when an individual purchases access to the Zumba Basic 1 video on-demand course on the Website, they begin the checkout process on this page:[32]



121.    When the customer arrives on this page, their FID and the page's URL are transmitted to Meta by Defendant via the Meta Pixel.

---

[32] Zumba Fitness, LLC, "Zumba – Ditch the Workout, Join the Party, available at https://www.zumba.com/en-US/training/register#/category.

122.    Further, Defendant uses the "Event Data" capabilities of the Meta Pixel to transmit even more detailed Private Video Information to Meta from this page.  For example, when a user selects the "On Demand" button from the above-pictured set of choices, Defendant sends the user's FID, the URL of the webpage, and the fact that they selected the "On Demand" option to Meta.

123.    Defendant accomplishes this through the 'Event Data' transmissions effected by the Meta Pixel (including, but not limited to, through the operation of the Meta Pixel's "fbevents.js:202" code), which Defendant intentionally installed on the Website, knowing and intending to make these transmissions.

124.    Users purchasing an on-demand video training course are then prompted to enter their email address.  Upon doing so, Defendant sends information to Meta including the user's FID, the URL of this webpage, the fact that they have selected the "On Demand" option, and their email address through operation of the Meta Pixel's "Event Data" capabilities.

125.    In the next step of the check-out flow, users purchasing an on-demand training course are prompted to enter their name, address, and billing information. Upon clicking 'Complete Registration,' Defendant sends the customer's name and address to Meta, along with the fact that the customer purchased the on-demand video materials, as well as the user's FID, the URL of this webpage, and their email address.

126.    When the purchase of an on-demand video instructor course is complete, the customer is routed to a new webpage (also hosted on Defendant's

Website).   This page says "YOU'RE ALL SET."   It also prominently displays: (1) the name of the individual who purchased the on-demand video materials and (2) the name of the specific video materials that the person purchased.   An example of one such a page is pictured below:[33]

---

[33] The name of individual who purchased the on-demand video materials and the name of the materials they purchased are circled in this example for emphasis.



127.    The "YOU'RE ALL SET" pages also have the Meta Pixel installed.

Defendant uses the Meta Pixel to transmit the URLs of these webpages, along with

the FIDs of the individuals who purchased the on-demand video materials and hwo are named on each page, to Meta.

128.    The "YOU'RE ALL SET" webpages pictured above—and containing the name of individual who purchased video materials from Defendant and the specific title of the on-demand video materials they purchased—remain live for several weeks after they are initially created at the end of the checkout flow.  That means any person with the URL for any one of these pages can simply enter the URL into an internet browser, reach the page, and determine exactly what video materials the consumer requested or obtained, as the pages are publicly accessible.

129.    Defendant also transmits the Private Video Information of consumers who purchase workout classes on its Website to Meta.

130.    Whenever a person with a Meta account purchases a prerecorded video workout class on the Website, the Defendant transmits Customer Information, Event Data, the user's FID, and the URLs of the webpages where the workout class video is available for sale to Meta through the operation of the Meta Pixel.

131.    Once a person purchases access to a prerecorded video workout class on Defendant's Website, they are then able to view that prerecorded video workout class on a dedicated webpage where only that video is available for viewing.  When they reach that page, Defendant transmits the page URL (which uniquely identifies the video hosted on that page) and the user's FID to Meta through the operation of the Meta Pixel.

132.    The URL of each webpage containing a prerecorded video workout class on Defendant's Website is sufficient to identify the video on that page.

133.    The name of the video hosted on any individual webpage available on Defendant's Website is sufficient to identify that video.

134.    In these ways, among other methods, Defendant knowingly discloses to Meta the Private Video Information of its consumers.

135.    Plaintiffs have purchased access to prerecorded video materials on Defendant's Website while logged into Facebook during the last two years. Accordingly, Defendant has transmitted Plaintiffs' identities and the fact that they requested or obtained prerecorded video material to Meta during the last two years.

136.    Defendant intentionally programmed its Website to include the Meta Pixel code in order to take advantage of the targeted advertising and other informational and analytical services offered by Meta.

137.    Once the Meta Pixel code is installed on a website, the website operator can access a dashboard on www.facebook.com to track website visitors' activities on the website, including Event Data, and to deliver targeted ads to those visitors on Meta's various internet properties.

138.    Defendant intentionally installed the Meta Pixel and transmitted the Private Video Information of Plaintiffs and the putative class members to Meta in order to take advantage of these internet tracking, marketing, and advertising services offered by Meta.

139.     The Meta Pixel code systematically transmits to Meta the FID of each person with a Meta account who requests or obtains prerecorded video material on its Website, along with URLs and other data identifying the prerecorded video materials that the person requested or obtained.

140.     With only a person's FID and the identity of the prerecorded video material requested or obtained (or URL where such material is available)—all of which Defendant knowingly provides to Meta on a systematic basis—any ordinary person could learn the identity of the person to whom the FID corresponds and identify the specific prerecorded video material that the person requested and obtained.  The person's identity can be determined by simply by accessing the URL www.facebook.com/[*insert the person's FID here*]/.

141.     Defendant's practice of disclosing the Private Video Information of its customers to Meta continued unabated for the duration of the two-year period preceding the filing of this action.

142.     At all times relevant hereto, whenever Plaintiffs or any other person requested or obtained prerecorded video material on Defendant's Website, Defendant disclosed to Meta (*inter alia*) the specific identity of the video material that was requested or obtained, along with the FID of the person who requested or obtained it (which, as discussed above, uniquely identified the person).

143.     At all times relevant hereto, Defendant knew that the Meta Pixel was disclosing its customers' Private Video Information to Meta.

144.    Although Defendant could easily have programmed its Website so that none of its customers' Private Video Information is disclosed to Meta, Defendant instead chose to program its Website so that all of its customers' Private Video Information is disclosed to Meta.

145.    Before transmitting its customers' Private Video Information to Meta, Defendant failed to notify any of them that it would do so, and none of them have ever consented (in writing or otherwise) to these practices.

146.    By intentionally disclosing to Meta Plaintiffs' and its other customers' FIDs together with the identity of the video materials that they each requested or obtained, without any of their consent to these practices, Defendant knowingly violated the VPPA on an enormous scale.

### B.    Pinterest

147.    Defendant also intentionally discloses Plaintiffs' and its other customers' Private Video Information to Pinterest by installing and maintaining the Pinterest Tag tracking pixel on the Website.

148.    The Pinterest Tag operates in a similar fashion to the Meta Pixel. Specifically, Pinterest assigns each account holder with a user ID, which is found in the "s_a" cookie that is an encrypted value identifying only one particular person's Pinterest account as they navigate non-Pinterest websites, similar to Meta's FID.  To create a Pinterest account, a person must provide their first and last name, age, gender (optional), email address, country, region, and preferred language.  This information

is directly linked to a person's s_a encrypted value, thereby directly allowing Pinterest to identify one particular person per s_a cookie.

149.    Defendant has intentionally installed and maintained the Pinterest Tag on its Website in order to take advantage of the tracking, marketing, and advertising services offered by Pinterest.

150.    Whenever a person logged into their Pinterest account requests or obtains prerecorded video materials from Defendant's Website, Defendant uses the Pinterest Tag to transmit the user ID included in the "s_a" cookie (which uniquely identifies the person to Pinterest) as well as the URL of the page where the person requested or obtained the prerecorded video materials (which uniquely identifies those materials) to Pinterest.

151.    Whenever a person logged into their Pinterest account purchases a pre-recorded, on-demand video training course from Defendant's Website, Defendant uses the Pinterest Tag to transmit the user ID included in the "s_a" cookie (which uniquely identifies the person to Pinterest) as well as the URL of the "YOU'RE ALL SET" page which identifies the person by name and the title of the video training course they purchased to Pinterest.

152.    At all times relevant hereto, Defendant knew that it was disclosing its customers' Private Video Information to Pinterest through the operation of the Pinterest Tag.

153.   Before transmitting its customers' Private Video Information to Pinterest, Defendant failed to notify any of them that it would do so, and none of them have ever consented (in writing or otherwise) to these practices.

154.   By intentionally disclosing to Pinterest its customers' unique identifiers together with the video materials that they each purchased, without any of their consent to these practices, Defendant knowingly violated the VPPA.

### C.   Google

155.   Defendant also intentionally discloses Plaintiffs' and its other customers' Private Video Information to Google by installing and maintaining the Google Tag tracking pixel on the Website.

156.   Google Analytics is a suite of software products which permits owners and operators or internet properties to "measure traffic and engagement across various platforms, like websites and apps."[34]

157.   Google Tag is the snippet of programming code which enables Google Analytics users to track activities taken by users on websites where it is installed.[35]

---

[34]    Google, "Introduction to Google Analytics," available at https://developers.google.com/analytics/devguides/collection/ga4.

[35]    Google, "Tagging for Google Analytics, available at https://developers.google.com/analytics/devguides/collection/ga4/tag-options.

158.    The Google Tag uses "first party cookies" to "distinguish unique users" and "distinguish sessions for a user."[36]

159.    Once the Google Tag is installed on a website, it can be configured to track actions taken by users on the website.  When actions are set to be tracked in Google Analytics, they are called 'Events.'  As Google explains:

> Events let you measure user interactions on your website or app; for example, you can measure when someone loads a page, clicks a link, and makes a purchase.  Google Analytics uses data from events to create reports with information about your business.[37]

160.    Google Analytics offers dozens of Events to track different actions that users take on a website.  Among them are:[38]

| Event | Triggers when a user . . . |
|-------|----------------------------|
| generate_lead | Submits a form or a request for information |
| purchase | Completes a purchase |
| add_to_cart | Adds items to their shopping cart |
| add_payment_info | Submits their payment information during checkout |

---

[36] *Id.*

[37]    Google,    "Set    up    events,"    accessible    at https://developers.google.com/analytics/devguides/collection/ga4/events?client_type=gtag.

[38]    Google,    "[GA4]    Recommended    Events,"    available    at https://support.google.com/analytics/answer/9267735.

161.    When user actions are tracked through Events, information associated with each Event and information sufficient to uniquely identify the user taking the corresponding action is sent to Google through the operation of the Google Tag.

162.    Websites with Google Tag installed use HTTP POST and GET requests to send information Google.[39]

163.    Defendant has intentionally installed and maintained the Google Tag and related Google Analytics code on its Website in order to take advantage of the tracking, marketing, and advertising services offered by Google.

164.    Whenever a person purchases a pre-recorded, on-demand video training course from Defendant's Website, Defendant uses the Google Tag to transmit the URL of the "YOU'RE ALL SET" page (which identifies, by name, the person who made the purchase and the title of the video training course they purchased) to Google.

165.    For example, the following screenshot depicts a "YOU'RE ALL SET" page generated by Defendant at the end of the purchase flow for the "Zumba Basic 1" video training course:

---

[39] *See* Google, "Send Measurement Protocol events to Google Analytics," available at https://developers.google.com/analytics/devguides/collection/protocol/ga4/sending-events?client_type=firebase.



166.    As shown above, the URL for this "YOU'RE ALL SET" page is

https://www.zumba.com/en-US/training/B200-TJO-

20250709172106/online_confirmation. As with all "YOU'RE ALL SET" pages

generated by Defendant on the Website, this URL will remain active for weeks after it was initially created at the end of the purchase flow.

167.    When Defendant generated the above-pictured "YOU'RE ALL SET" page, it sent the page's URL to Google through the operation of the Google Tag, as reflected in the following screenshot showing data transmission associated with that page:



168.    The "%" symbols in the data transmission pictured above represent hash marks that Google uses to mark up the URL into a form that is automatically readable and understandable as a URL by the Google Analytics software.

169.    A customer does not need to be logged into a Google account or any other account for Google to receive this URL from Defendant.

170.     Defendant intentionally configured the Google Tag to disclose its customer's Private Video Information in this manner.

171.     As further proof of that intent, Defendant has enabled the "Purchase" Event in the Google Tag operating on the Website, as shown in the following screenshot showing data transmissions associated with the "YOU'RE ALL SET" page pictured above:



172.     Thus, whenever a person purchases a video training course on the Website, Defendant sends Google: (1) a URL identifying the person and the video review course they purchased by name, and (2) and Event code indicating that the person completed a purchase.

173.     Defendant further uses the Google Tag and Google Analytics to send the Private Video Information of consumers who purchase prerecorded video workout classes on the Website to Google.

174.     At all times relevant hereto, Defendant knew that it was disclosing its customers' Private Video Information to Google through the operation of the Google Tag and Google Analytics.

175.     Before transmitting its customers' Private Video Information to Google, Defendant failed to notify any of them that it would do so, and none of them have ever consented (in writing or otherwise) to these practices.

176.     By intentionally disclosing to Google its customers' unique identifiers together with the video materials that they each purchased, without any of their consent to these practices, Defendant knowingly violated the VPPA.

**D.    Twitter**

177.     Defendant also intentionally discloses Plaintiffs' and its other customers' Private Video Information to Twitter by installing and maintaining the X Pixel on the Website.

178.     The X Pixel is a "a website tag that is implemented on your website to track site actions or conversions."[40]

---

[40] Twitter, "Conversion tracking for websites," available at https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites.

179.     The X Pixel is made up of two parts: base code and event code.[41]

180.     The X Pixel's base code "tracks visits to a website and initializes the pixel so that you can track additional events via event code or create audiences using Audience Manager."[42]

181.     The X Pixel's event code "allows you to track individual actions on your website, like an add-to-cart button or purchase."

182.     Websites with X Pixel installed use HTTP POST and GET requests to send information to Twitter.

183.     Defendant has intentionally installed and maintained the X Pixel and related code on its Website in order to take advantage of the tracking, marketing, and advertising services offered by Twitter.

184.     Whenever a person purchases a pre-recorded, on-demand video training course from Defendant's Website, Defendant uses the X Pixel to transmit the URL of the "YOU'RE ALL SET" page (which, again, identifies, by name the person who made the purchase and the title of the video training course they purchased) to Twitter.

185.     For example, the URL for the "YOU'RE ALL SET" page pictured in Paragraph 165 above is: https://www.zumba.com/en-US/training/B200-TJO-

---

[41] *Id.*

[42] *Id.*

20250709172106/online_confirmation.   As with all "YOU'RE ALL SET" pages

generated by Defendant on the Website, this URL will remain active for weeks after

it was initially created at the end of the purchase flow.

186.   When Defendant generated this "YOU'RE ALL SET" page, it sent the

page's URL to Twitter through the operation of the X Pixel, as reflected in the

following screenshot:



187.   The "%" symbols in the data transmission pictured above represent

hash marks that Twitter uses to mark up the URL into a form that is automatically

readable and understandable as a URL by Twitter.

188.   Defendant further uses the X Pixel to send the Private Video

Information of consumers who purchase prerecorded video workout classes on the

Website to Twitter.

189.     A customer does not need to be logged into a Twitter account or any other account for Twitter to receive this URL from Defendant.

190.     Defendant intentionally configured the X Pixel to disclose its customer's Private Video Information in this manner.

191.     At all times relevant hereto, Defendant knew that it was disclosing its customers' Private Video Information to Twitter through the operation of the X Pixel.

192.     Before transmitting its customers' Private Video Information to Twitter, Defendant failed to notify any of them that it would do so, and none of them have ever consented (in writing or otherwise) to these practices.

193.     By intentionally disclosing to Twitter its customers' unique identifiers together with the video materials that they each purchased, without any of their consent to these practices, Defendant knowingly violated the VPPA.

### E.     Hubspot

194.     Defendant also intentionally discloses Plaintiffs' and its other customers' Private Video Information to Hubspot by installing and maintaining the Hubspot Tracking Code on the Website.

195.     The Hubspot Tracking Code "allows HubSpot to monitor your website traffic."[43]

---

[43]     HubSpot, "Install the HubSpot tracking code" available at https://knowledge.hubspot.com/reports/install-the-hubspot-tracking-code.

196.    As explained by HubSpot, "If you have any externally hosted pages (i.e., pages not on HubSpot)," such as the Website, "you must install the HubSpot tracking code manually to capture analytics for those pages."[44]

197.    The HubSpot Tracking Code collects personally identifying information such as names and email addresses from forms completed by visitors to websites (e.g., the form completed by consumers on Defendant's Website as part of the checkout flow): "If and when a visitor fills out a form, HubSpot will associate their previous page views based on the tracking cookie. If the email address filled in the form is associated with an existing contact, this visitor will be identified as the contact."[45]

198.    Like the other pixels and tracking codes, "In addition to tracking page views, the HubSpot tracking code allows you to identify visitors, track events, and manually track page views (without reloading the page)."[46]

199.    Every data transmission to HubSpot from a website with the HubSpot Tracking Code installed contains the URL of the page that generated the transmission.

---

[44] *Id.*

[45] HubSpot, "Track Visitors in HubSpot," available at https://knowledge.hubspot.com/account/how-does-hubspot-track-visitors?hubs_content=knowledge.hubspot.com/reports/install-the-hubspot-tracking-code&hubs_content-cta=tracking-code-allows-you-to-track-visitors-to-your-website.

[46] HubSpot, "Tracking code reference (v1)," available at https://developers.hubspot.com/docs/reference/api/analytics-and-events/tracking-code/v1?hubs_content=knowledge.hubspot.com/reports/install-the-hubspot-tracking-code&hubs_content-cta=tracking-code-allows-you-to-track-visitors-to-your-website&_ga=2.202122258.246567659.1752590359-549297264.1752590359

200.    Websites with the HubSpot Tracking Code installed use HTTP POST and GET requests to send information to HubSpot.

201.    Defendant has intentionally installed and maintained the HubSpot Tracking Code on its Website in order to take advantage of the tracking, marketing, and advertising services offered by Hubspot.

202.    Whenever a person purchases a pre-recorded, on-demand video training course from Defendant's Website, Defendant uses the HubSpot Tracking Code to transmit the URL of the "YOU'RE ALL SET" page (which, again, identifies, by name the person who made the purchase and the title of the video training course the person purchased) to HubSpot.

203.    For example, the URL for the "YOU'RE ALL SET" page pictured in Paragraph 165 above is: https://www.zumba.com/en-US/training/B200-TJO-20250709172106/online_confirmation.   As with all "YOU'RE ALL SET" pages generated by Defendant on the Website, this URL will remain active for weeks after it was initially created at the end of the purchase flow.

204.    When Defendant generated the "YOU'RE ALL SET" page pictured in Paragraph 165 above, it sent the page's URL to HubSpot through the operation of the HubSpot Tracking Code, as reflected in the following screenshot:

205.     The "%" symbols and adjoining capital letters in the data transmission pictured above represent hash marks that HubSpot uses to mark up the URL into a form that is automatically readable and understandable as a URL.

206.     A customer does not need to be logged into any particular account for HubSpot to receive this URL from Defendant.

207.     Defendant further uses the HubSpot Tracking Code to send the Private Video Information of consumers who purchase prerecorded video workout classes on the Website to HubSpot.

208.     Defendant intentionally configured the HubSpot Tracking Code to disclose its customer's Private Video Information in this manner.

209.     At all times relevant hereto, Defendant knew that it was disclosing its customers' Private Video Information to Twitter through the operation of the HubSpot Tracking Code.

210.    Before transmitting its customers' Private Video Information to HubSpot, Defendant failed to notify any of them that it would do so, and none of them have ever consented (in writing or otherwise) to these practices.

211.    By intentionally disclosing to HubSpot its customers' unique identifiers together with the video materials that they each purchased, without any of their consent to these practices, Defendant knowingly violated the VPPA.

**F.    NextRoll**

212.    Defendant also intentionally discloses Plaintiffs' and its other customers' Private Video Information to NextRoll by installing and maintaining the AdRoll Pixel on the Website.

213.    The AdRoll Pixel "is a JavaScript code snippet that tracks your website traffic and visitor behavior."[47]

214.    As explained by NextRoll, "Installing the Pixel allows us to understand your website visitor traffic so that you can define your high-value website audiences, define your conversion audiences, and run advertising programs, for example, retargeting campaigns."[48]

---

[47] NextRoll, "Introduction to the Pixel: Connect AdRoll to Your Website" available at https://help.adroll.com/hc/en-us/articles/211846018-Introduction-to-the-Pixel-Connect-AdRoll-to-your-Website#h_01JZ180XQ49SBSPVXW4Q3G5R5R.

[48] *Id.*

215.    The AdRoll Pixel can be configured to collect "specific form fields for entry collection (first name, last name, email)."[49]

216.    Every data transmission to NextRoll from any website with the AdRoll Pixel installed contains the URL of the page that generated the transmission.

217.    Websites with the AdRoll Pixel installed use HTTP POST and GET requests to send information to NextRoll.

218.    Defendant has intentionally installed and maintained the AdRoll Pixel on its Website in order to take advantage of the tracking, marketing, and advertising services offered by NextRoll.

219.    Whenever a person purchases a pre-recorded, on-demand video training course from Defendant's Website, Defendant uses the AdRoll Pixel to transmit the URL of the "YOU'RE ALL SET" page (which, again, identifies, by name the person who made the purchase and the title of the video training course the person purchased) to NextRoll.

220.    For example, the URL for the "YOU'RE ALL SET" page pictured in Paragraph 165 above is:   https://www.zumba.com/en-US/training/B200-TJO-20250709172106/online_confirmation.   As with all "YOU'RE ALL SET" pages generated by Defendant on the Website, this URL will remain active for weeks after it was initially created at the end of the purchase flow.

---

[49] NextRoll, "Pixel Assistant Guide – AdRoll Help Center," available at https://help.adroll.com/hc/en-us/articles/8261197025165-Pixel-Assistant-Guide.

221.    When Defendant generated the "YOU'RE ALL SET" page pictured in Paragraph 165 above, it sent the page's URL to NextRoll through the operation of the AdRoll Pixel, as reflected in the following screenshot:



| ▼ Request Headers | |
|---|---|
| :authority | d.adroll.com |
| :method | GET |
| :path | /consent/check/77BTKOJJEFG7PF6GBAR2SF? adroll_fpc=d94b7ce3240b2c7ef32367b3a5d5a6b5- 1749736157398&flg=1&pv=30928375015.855747&arrfrr=https%3A%2F%2F www.zumba.com%2Fen-US%2Ftraining%2FB200-TJO- 20250709172106%2Fonline_confirmation&_s=50c75dc21065b911d4fa52291 388aa4f&_b=2 |

222.    The "%" symbols and adjoining capital letters in the data transmission pictured above represent hash marks that mark up the URL into a form that is automatically readable and understandable as a URL by NextRoll's software.

223.    A customer does not need to be logged into any particular account for NextRoll to receive this URL from Defendant.

224.    Defendant further uses the AdRoll Pixel to send the Private Video Information of consumers who purchase prerecorded video workout classes on the Website to NextRoll.

225.    Defendant intentionally configured the AdRoll Pixel to disclose its customer's Private Video Information in this manner.

226.    At all times relevant hereto, Defendant knew that it was disclosing its customers' Private Video Information to Twitter through the operation of the AdRoll Pixel.

227.    Before transmitting its customers' Private Video Information to NextRoll, Defendant failed to notify any of them that it would do so, and none of them have ever consented (in writing or otherwise) to these practices.

228.    By intentionally disclosing to NextRoll its customers' unique identifiers together with the video materials that they each purchased, without any of their consent to these practices, Defendant knowingly violated the VPPA.

### G.    theTradeDesk

229.    Defendant also intentionally discloses Plaintiffs' and its other customers' Private Video Information to theTradeDesk by installing and maintaining the Trade Desk Pixel on the Website.

230.    The Trade Desk Pixel is a "tracking tag that contains JavaScript (JS)."[50]

231.    theTradeDesk also provides a Real-Time Conversion Events API which "enables partners to send conversion events they captured to The Trade Desk platform so that they can be used for retargeting and attribution as part of an advertiser's marketing campaigns."[51]

232.    Like the other tracking pixels, the Trade Desk Pixel includes event data capabilities to track specific actions users take on websites.  Among its default events

---

[50] theTradeDesk, "Universal Pixel," available at
https://partner.thetradedesk.com/v3/portal/data/doc/TrackingTagsUniversalPixel.

[51] theTradeDesk, "Real-Time Conversion Events," available at
https://partner.thetradedesk.com/v3/portal/data/doc/DataConversionEventsApi.

are "addtocart" ("The user added an item to the shopping cart") and "purchase" ("The user completed a purchase and has the Thank You page displayed.").

233. By combining the Trade Desk Pixel with the Real-Time Conversion Events API, websites operators receive "Support for including multiple items in a single event. For example, cart-level data."

234. theTradeDesk explains that "To optimize real-time web tracking, the universal pixel automatically sends URL conversion data to the POST /track/realtimeconversion endpoint."[52] It further explains: "This endpoint uses a specific environment: https://insight.adsrvr.org."[53] Thus, insight.adsrvr.org is the designated tracking URL for theTradeDesk.

235. Every data transmission to theTradeDesk from any website with the Trade Desk Pixel installed contains the URL of the page that generated the transmission.

236. Websites with the Trade Desk Pixel installed use HTTP POST and GET requests to send information to theTradeDesk.

---

[52] theTradeDesk, "Universal Pixel," available at
https://partner.thetradedesk.com/v3/portal/data/doc/TrackingTagsUniversalPixel.

[53] theTradeDesk, "Post /trackrealtimeconversion", available at
https://partner.thetradedesk.com/v3/portal/data/doc/post-track-realtimeconversion.

237.    Defendant has intentionally installed and maintained the Trade Desk Pixel on its Website in order to take advantage of the tracking, marketing, and advertising services offered by theTradeDesk.

238.    Whenever a person purchases a pre-recorded, on-demand video training course from Defendant's Website, Defendant uses the Trade Desk Pixel to transmit the URL of the "YOU'RE ALL SET" page (which, again, identifies, by name the person who made the purchase and the title of the video training course the person purchased) to theTradeDesk.

239.    For example, the URL for the "YOU'RE ALL SET" page pictured in Paragraph 165 above is:  https://www.zumba.com/en-US/training/B200-TJO-20250709172106/online_confirmation.   As with all "YOU'RE ALL SET" pages generated by Defendant on the Website, this URL will remain active for weeks after it was initially created at the end of the purchase flow.

240.    When Defendant generated the "YOU'RE ALL SET" page pictured in Paragraph 165 above, it sent the page's URL to theTradeDesk through the operation of the Trade Desk Pixel, as reflected in the following screenshot:

▼ Request Headers

| :authority | insight.adsrvr.org |
| :method | GET |
| :path | /track/cei?<br>advertiser_id=0216j9i&cookie_sync=1&upv=3.0.0&upid<br>=tmd9w9v&gdpr=0&paapi=1&ref=https://www.zumba.c<br>om/en-US/training/B200-TJO-<br>20250709172106/online_confirmation |

241.    A customer does not need to be logged into any particular account for theTradeDesk to receive this URL from Defendant.

242.    Defendant further uses the Trade Desk Pixel to send the Private Video Information of consumers who purchase prerecorded video workout classes on the Website to theTradeDesk.

243.    Defendant intentionally configured the Trade Desk Pixel to disclose its customer's Private Video Information in this manner.

244.    At all times relevant hereto, Defendant knew that it was disclosing its customers' Private Video Information to theTradeDesk through the operation of the Trade Desk Pixel.

245.    Before transmitting its customers' Private Video Information to theTradeDesk, Defendant failed to notify any of them that it would do so, and none of them have ever consented (in writing or otherwise) to these practices.

246.    By intentionally disclosing to theTradeDesk its customers' unique identifiers together with the video materials that they each purchased, without any of their consent to these practices, Defendant knowingly violated the VPPA.

### H.    Mountain

247.    Defendant also intentionally discloses Plaintiffs' and its other customers' Private Video Information to Mountain by installing and maintaining the MNTN Pixel on the Website.

248.    The MNTN Pixel is a "a piece of JavaScript code that you install directly into the HTML code on your site."[54]

249.    As Mountain explains, "A tracking pixel follows how users behave on your site, collecting data like the pages and/or products they view, while a conversion pixel keeps a tally of when users convert, as with a completed demo request form or a purchase."[55]

250.  Like the other tracking pixels, the Trade Desk Pixel includes event data capabilities to track specific actions users take on websites.  Among its default events are "addtocart" ("The user added an item to the shopping cart") and "purchase" ("The user completed a purchase and has the Thank You page displayed.").

---

[54] Mountain, "A B2b Starter Guide to Installing Pixels and Managing Data (Without Having to Learn a New Dashboard), https://mountain.com/wp-content/uploads/2024/02/MNTN-Quick-Hit-B2B-Set-Up-and-Measurement.pdf

[55] *Id.*

251.   The MNTN Pixel "track[s] user behavior and collect[s] site-specific data on viewed pages and products," including "Direct Sale Categories" such as "Product Name," "Product Category," "Product SKU," and "Shopping Cart Value."[56]

252.   The MNTN Pixel also "fires upon the completion of an event that you specify, whether that's when a lead form is completed, a specific click event occurs, a direct purchase is made, etc."

253.   Every data transmission to Mountain from any website with the MNTN Pixel installed contains the URL of the page that generated the transmission.

254.   Websites with the MNTN Pixel installed use HTTP POST and GET requests to send information to Mountain.

255.   Defendant has intentionally installed and maintained the MNTN Pixel on its Website in order to take advantage of the tracking, marketing, and advertising services offered by Mountain.

256.   Whenever a person purchases a pre-recorded, on-demand video training course from Defendant's Website, Defendant uses the MNTN Pixel to transmit the URL of the "YOU'RE ALL SET" page (which, again, identifies, by name the person who made the purchase and the title of the video training course the person purchased) to Mountain.

---

[56] *Id.*

257.    For example, the URL for the "YOU'RE ALL SET" page pictured in Paragraph 165 above is: https://www.zumba.com/en-US/training/B200-TJO-20250709172106/online_confirmation.   As with all "YOU'RE ALL SET" pages generated by Defendant on the Website, this URL will remain active for weeks after it was initially created at the end of the purchase flow.

258.    When Defendant generated the "YOU'RE ALL SET" page pictured in Paragraph 165 above, it sent the page's URL to Mountain through the operation of the MNTN Pixel, as reflected in the following screenshot:



259.    A customer does not need to be logged into any particular account for Mountain to receive this URL from Defendant.

260.    Defendant further uses the MNTN Pixel to send the Private Video Information of consumers who purchase prerecorded video workout classes on the Website to Mountain.

261.    Defendant intentionally configured the MNTN Pixel to disclose its customer's Private Video Information in this manner.

262.    At all times relevant hereto, Defendant knew that it was disclosing its customers' Private Video Information to Mountain through the operation of the MNTN Pixel.

263.    Before transmitting its customers' Private Video Information to Mountain, Defendant failed to notify any of them that it would do so, and none of them have ever consented (in writing or otherwise) to these practices.

264.    By intentionally disclosing to Mountain its customers' unique identifiers together with the video materials that they each purchased, without any of their consent to these practices, Defendant knowingly violated the VPPA.

## CLASS ACTION ALLEGATIONS

265.    Plaintiffs seek to represent a class defined as all persons in the United States who, during the two years preceding the filing of this action, purchased access to video materials on the Website (www.zumba.com) and had their Private Video Information transmitted to a third party.

266.    Class members are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in at least the tens of thousands.   The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery.   Class

members may be notified of the pendency of this action by mail and/or publication through the membership records of Defendant.

267.    Common questions of law and fact exist for all Class members and predominate over questions affecting only individual class members.  Common legal and factual questions include but are not limited to (a) whether Defendant embedded tracking pixels on its Website that monitor and track actions taken by visitors to its Website; (b) whether Defendant reports the actions and information of visitors to third parties; (c) whether Defendant knowingly disclosed Plaintiffs' and the Class members' Private Video Information to third parties;  (d) whether Defendant's conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710; and (e) whether Plaintiffs and Class members are each entitled to a statutory damage award of $2,500, as provided by the VPPA.

268.    The named Plaintiffs' claims are typical of the claims of the Class in that the Defendant's conduct toward the putative class is the same.   That is, Defendant embedded tracking pixels on its Website to monitor and track actions taken by class members to its Website and report this to third parties.   Further, the named Plaintiffs and the Class members suffered invasions of their statutorily protected right to privacy (as afforded by the VPPA), as well as intrusions upon their private affairs and concerns that would be highly offensive to a reasonable person, as a result of Defendant's uniform and wrongful conduct in intentionally disclosing their Private Video Information to third parties.

269.    Plaintiffs are adequate representatives of the Class because they are interested in the litigation; their interests do not conflict with those of the Class members they seek to represent; they have retained competent counsel experienced in prosecuting class actions and intends to prosecute this action vigorously.   Plaintiffs and their counsel will fairly and adequately protect the interests of all Class members.

270.    The class mechanism is superior to other available means for the fair and efficient adjudication of Class members' claims.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by this case's complex legal and factual issues.    Individualized litigation also presents a potential for inconsistent or contradictory judgments.   In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication of the common questions of law and fact, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**CAUSE OF ACTION**
**Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710**

271.    Plaintiffs repeat the allegations asserted in the preceding paragraphs as if fully set forth herein.

272.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

273.    As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials[.]" Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it is engaged in the business of selling and delivering prerecorded video materials, similar to prerecorded video cassette tapes, to consumers nationwide.

274.    As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or consumer of goods or services from a video tape service provider." As alleged above, Plaintiffs and each of the Class members are a "consumer" within the meaning of the VPPA because they each purchased access to prerecorded video material or purchased prerecorded video material from Defendant's Website that was sold and delivered to them by Defendant.

275.   As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  The Private Video Information that Defendant transmitted to third parties constitutes "personally identifiable information" as defined in 18 U.S.C. § 2710(a)(3) because it identifies Plaintiffs and the Class members to third parties as individuals who purchased, and thus "requested or obtained," specific prerecorded video materials or a subscription to access prerecorded video materials from Defendant via its Website.

276.   Defendant knowingly disclosed Plaintiffs' and the Class members' Private Video Information to third parties via tracking pixel technology because Defendant intentionally installed and programmed the tracking pixel code on its Website, knowing that such code would transmit to third parties the identities of the video materials requested or obtained by its customers coupled with its customers' unique identifiers (including FIDs).

277.   Defendant further knowingly disclosed Plaintiffs' and the Class members' Private Video Information to third parties via the pixel tracking technology because Defendant intentionally installed and programmed the pixel tracking code on its Website, knowing that such code would transmit to third parties the purchases of specific prerecorded video materials requested or obtained by its customers coupled with its customers' unique identifiers (including FIDs).

278.    Defendant failed to obtain informed written consent from Plaintiffs or any of the Class members authorizing it to disclose their Private Video Information to any third party.  More specifically, at no time prior to or during the applicable statutory period did Defendant obtain from any person who purchased prerecorded video material on its Website (including Plaintiffs or any of the Class members) informed, written consent that was given in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer, that was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner, or that was given after Defendant provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election. *See* 18 U.S.C. § 2710(b)(2).

279.    By disclosing Plaintiffs' and Class members' Private Video Information, Defendant violated their statutorily protected right to privacy in their Private Video Information.

280.    Consequently, Defendant is liable to Plaintiffs and each of the Class members for damages in the statutorily set sum of $2,500.  18 U.S.C. § 2710(c)(2)(A).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek a judgment against Defendant Zumba Fitness, LLC, as follows:

a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

b) For an order declaring that Defendant's conduct as described herein violated the VPPA;

c) For an order finding in favor of Plaintiffs and the Class and against Defendant on all counts asserted herein;

d) For an award of $2,500.00 to each of Plaintiffs and the Class members, as provided by 18 U.S.C. § 2710(c);

e) For an order permanently enjoining Defendant from disclosing the Private Video Information of its consumers to third parties in violation of the VPPA;

f) For prejudgment interest on all amounts awarded; and

g) For an order awarding punitive damages, reasonable attorneys' fees, and costs to counsel for Plaintiffs and the Class under Rule 23 and 18 U.S.C. § 2710(c).

Respectfully submitted,

Dated: July 21, 2025                    HEDIN LLP

/s/ *Elliot O. Jackson*
Elliot O. Jackson
Florida Bar No. 1034536
1395 Brickell Ave, Suite 610
Miami, Florida 33131
Telephone: (305) 357-2107
Facsimile:  (305) 200-8801
ejackson@hedinllp.com

Tyler K. Somes (*pro hac vice*)
District of Columbia Bar No. 90013925
HEDIN LLP
1100 15th Street NW, Ste 04-108
Washington, D.C. 20005
Telephone: (202) 900-3332
Facsimile:  (305) 200-8801
tsomes@hedinllp.com

*Counsel for Plaintiffs and Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will provide electronic notification of such filing to all parties of record.

/s/ *Tyler K. Somes*